RIMM, J.T.C.
This is a gross income tax matter in which defendant originally assessed taxes against plaintiffs[1] for 1985 in the amount of $226,941, together with interest and penalties. The assessment of taxes is based on defendant’s claim that plaintiff was a resident of the State of New Jersey in 1985 and had income as follows:
Wages $ 32,425
Interest 48,071
Dividends 10,040
Capital Gains 4,092,378
Pensions 2,251,350
Other Income 70,917
Total $6,505,181
*558 The capital gains and pensions items comprise payment to plaintiff of $6,460,999[2] in 1985 from the profit sharing plan of his employer, National Telephone Directory Corporation (NTD).
Plaintiff contends that he was a nonresident of New Jersey in 1985, that his total New Jersey source income was $2,402, and therefore, no tax is due for the year 1985.[3]
Defendant also claims, in the alternative, that, even if plaintiff were not a resident of New Jersey in 1985, the total amount of tax due is $228,662, together with interest and penalties, based on New Jersey source income as follows:
Wages $ 32,425
Capital Gains 4,199,649
Pensions 2,251,350
Other Income 70,917
Total $6,554,341
If plaintiff was a resident of New Jersey in 1985, then the amount claimed to be due from him as a resident is correct, and there is no further issue before the court. Even if plaintiff was not a resident of New Jersey in 1985, defendant claims that plaintiffs income was New Jersey source income and is taxable to him in New Jersey in any event in accordance with N.J.S.A. 54A:5-5 and 54A:5-8, defining the income of nonresidents subject to tax.
In accordance with N.J.S.A. 54A:l-2.m., a resident taxpayer is an individual:
1. Who is domiciled in this State, unless he maintains no permanent place of abode in this State, maintains a permanent place of abode elsewhere, and spends in the aggregate no more than 30 days of the taxable year in this State; or
*559 2. Who is not domiciled in this State but maintains a permanent place of abode in this State and spends in the aggregate more than 183 days of the taxable year in this State, unless such individual is in the Armed Forces of the United States.
A nonresident taxpayer is a taxpayer who is not a resident. N.J.S.A. 54A:l-2.n.
Based on the totality of the evidence presented to me on the issue, and the credibility of plaintiff, Malcolm W. McDonald, I find that plaintiff was not domiciled in New Jersey in 1985. He had effectively established a domicile in the State of Florida for the year 1985. For a number of years, plaintiff had spent substantial amounts of time in Florida, vacationing there regularly since 1960, first in Ft. Lauderdale and then, from 1970, in Delray Beach. By 1983, all of plaintiffs five children were married and no longer living at home. On December 1, 1983, plaintiff purchased two residential units in Delray Beach and commenced converting them into one residential unit.[4]
When the purchase was made, plaintiff intended Florida to be his permanent home, and he did not intend at any time thereafter to return and take up permanent residence in New Jersey. Plaintiffs New Jersey home was retained for convenience on visits to New Jersey and to have a place for his children to join him on those visits from time to time. Plaintiff registered to vote in Florida on April 23, 1984, and voted in person in Florida in 1984 and 1988. He did not vote in any other jurisdiction in 1984 or thereafter. In addition, plaintiff made no claim for a New Jersey homestead rebate for the year 1985, based on his nonresident status as of October 1, 1984. Cf. Quick v. Taxation Div. Director, 9 N.J. Tax 288 (Tax Ct.1987). He also obtained a Florida driver’s license, and in January 1985 he registered his automobile in Florida, having previously leased a car there. On May 1, 1985, he filed a declaration of domicile in Florida in preparation for filing for a Florida homestead rebate. The declaration of domicile included a sworn statement that *560 plaintiff established his domicile in Florida on April 24, 1984. Plaintiff filed Florida intangible property tax returns beginning with 1985, reporting intangible assets owned by him on January 1, 1985, which return was required under Florida law because plaintiff had become a legal resident of Florida prior to January 1, 1985. Other actions indicating the establishment of domicile in Florida included church membership, leasing safety deposit boxes, filing federal income tax returns with a Florida address and maintaining a checking account in a Florida bank from which the vast majority of plaintiff’s bills were paid. Plaintiff had the necessary physical presence and intent to remain in Florida indefinitely prior to 1985 to establish domicile. Wolff v. Taxation Div. Director, 9 N.J. Tax 11 (Tax Ct.1986).
Defendant claims that even if plaintiff was not domiciled in New Jersey he was nevertheless a resident taxpayer in 1985, because he maintained a permanent place of abode in this State in 1985 and spent more than 183 days in the State. Again, based on the totality of the evidence and the credibility of plaintiff, I find that, although plaintiff maintains a permanent place of abode in this State, he did not spend more than 183 days in New Jersey in 1985. Plaintiff spent time in the year 1985 in Florida. He also visited family in Massachusetts and New York State, and he visited his daughter in Brooklyn, New York, in 1985. Plaintiff also visited New Jersey in 1985 and was in New Jersey on various dates during that year. However, I find as a fact that plaintiff only spent 143 days in New Jersey in 1985. Accordingly, plaintiff was a nonresident taxpayer of the State of New Jersey for the year 1985. N.J.S.A. 54A:1-2.m.2.
Such a determination that plaintiff was not a resident of New Jersey in 1985 does not, however, benefit him. In fact, finding that he was a nonresident in 1985 results in the imposition of more taxes than if he was a resident of the State of New Jersey in 1985. This is because of plaintiff’s 1985 New Jersey source income. Plaintiff’s wages, capital gains, pensions and other income items all had their sources in New Jersey in 1985. *561 Plaintiff is to be taxed on those items as a nonresident whose income had a New Jersey source. N.J.S.A. 54A:5-5 and 54A:5-8. Plaintiff is also not entitled to deduct from his capital gains a capital loss with a source outside of New Jersey. N.J.S.A. 54A:5-2 and 54:5-8.
The United States Supreme Court has held that a state may tax the income of nonresidents.
[J]ust as a state may impose general income taxes upon its own citizens and residents whose persons are subject to its control, it may, as a necessary consequence, levy a duty of like character, and not more onerous in its effect, upon the incomes accruing to nonresidents from their property or business within the state, or their occupations carried on therein, enforcing payment, so far as it can, by the exercise of a just control over persons and property within its borders. [Shaffer v. Carter, 252 U.S. 37, 52, 40 S.Ct. 221, 64 L.Ed. 445 (1920)].
The ability of New Jersey to tax income depends on the existence of sufficient contacts and benefits to comply with constitutional due process requirements. Potter v. Taxation Div. Director, 5 N.J.Tax 399, 404 (Tax.Ct.1983).
The item in defendant’s assessment indicated as wages in the amount of $32,425 corresponds to the $32,425 recorded on plaintiff’s 1985 Federal income tax return as salary from NTD, his New Jersey employer. This amount consisted of a $25,000 bonus paid to plaintiff for the previous year’s services and $7,425 for salary between January 1, 1985 and February 7, 1985. Although plaintiff resigned as president of NTD as of July 1, 1984, he then became vice-chairman of the board of directors and was paid a salary as such until he retired from the company on February 7, 1985. These payments were made to plaintiff in consideration of services rendered to his employer and constitute New Jersey source income. They are reflected on a W-2 form attached to plaintiff’s 1985 federal income tax return, and they constitute compensation earned by plaintiff “[i]n connection with a[n] ... occupation carried on in this State or for the rendition of personal services performed in this State.” N.J.S.A. 54A:5-8(2).
The “other income” item in the amount of $70,917 in the defendant’s assessment corresponds to the $70,917 listed in *562 plaintiff’s 1985 federal income tax return under miscellaneous income as reported on line 22 of that return. The statement attached to the return explaining miscellaneous income indicates that it consisted of two payments, both from NTD. One was in the amount of $2,000 and was explained in plaintiff’s testimony as a car allowance based on the company’s supplying a car to him in 1985 for his use in performing services for the company. The other item in the amount of $68,917 was also from NTD. Part of this amount was director’s fees paid to plaintiff for services as a director of NTD in 1985. The balance of this amount was paid to plaintiff under a separate retirement agreement entered into between him and the corporation in recognition of excellence in the performance of his duties and his faithful service to the company. In addition to plaintiff, only two other employees of the corporation had such special, separate retirement agreements. This “other income” was received by plaintiff from his New Jersey employer and similarly constitutes New Jersey source income in connection with an occupation or for services rendered in accordance with N.J.S.A. 54A:5-8.
The significant dispute, however, between the parties involves two payments made to plaintiff in 1985 totaling $6,460,-999 from the profit sharing plan of NTD. Of that total sum, $4,199,649 was treated by plaintiff on his federal income tax return as a lump sum distribution constituting long-term capital gain. It was similarly treated by defendant. The balance of $2,261,350 was treated by defendant as payment from a pension, with a $10,000 exemption under N.J.S.A. 54A:6-10 resulting in a pension item in plaintiff’s taxable income for New Jersey gross income tax purposes of $2,251,350.
Plaintiff was first employed by NTD in 1948, and until 1954 he worked for that company in Cambridge, Massachusetts. In 1954 he moved to New Jersey and continued his work for the company, ultimately becoming president. At all times pertinent to this matter, NTD had its corporate headquarters and main office in Union, New Jersey. The corporation also maintained *563 an office in Haddonfield, New Jersey. Plaintiff worked in both offices.
On December 2, 1953, NTD created and established a profit sharing plan and trust “in order to reward the faithful and efficient services of its employees and to provide such employees an opportunity to accumulate funds for their retirement and financial emergencies____” By an agreement and declaration of trust dated November 30, 1976, the corporation, on the one part, and plaintiff and one John M. Feltmann, on the other part, as trustees, entered into an agreement constituting “a complete restatement and redeclaration of the company’s profit sharing plan and trust in substitution for and in place of all the provisions of the original plan and trust as heretofore amended ____” The agreement provided that the plan and trust shall be known as the “National Telephone Directory Corporation Profit Sharing Plan and Trust.” The trust was thereafter amended by amendments dated May 4, 1977, March 28, 1979, November 12, 1980, April 15, 1981 and November 30, 1983.[5]
The NTD profit sharing plan and trust as restated and redeclared in the agreement of November 30, 1976 contains, among other things, the following provisions. The plan and trust is for “the purpose of enabling the participating employees of the company or their beneficiaries to share in a portion of the profits of the company,” with the corpus income of the trust to be used “for the exclusive benefit of the participating employees or their beneficiaries.”
Compensation is defined in the agreement, for employees such as plaintiff, as “the total remuneration paid to and received by an employee of the company, including basic annual salary or wages, bonuses, overtime, commissions, leave of absence pay, paid vacations, suggestion awards and other similar payments.” Current profits are defined as “the annual net *564 profits of the company as determined by its accountants in accordance with standard and accepted accounting practice,” before certain deductions specified in the agreement. An employee is defined as “any individual on the company’s regular payroll,” but not including an individual who is not subject to the control or the direction of the company as to the means and methods for accomplishing his work. Employee does not include “an individual on the company’s regular payroll who is covered by a collective bargaining agreement” which contains in it the subject of retirement benefits.
Employees are not permitted to make contributions to the plan and trust and all contributions to it are made only by the company from its net profits. The trustees of the plan and trust are required by the agreement to maintain an account in the name of each participant and are required to credit the account with the participant’s proportionate share of the company’s contributions; forfeitures; and earnings or losses of the trust. There is to be allocated to each individual account an amount “which is the same proportion of such contribution as such participant’s compensation for such year is to the total compensation of all such participants for such year.” In the event that a participant’s employment is terminated before his benefits are 100% vested, the non-vested percentage of the terminated employee’s accrued benefit shall be forfeited and reallocated to the accounts of all of the other participants in the same manner that company contributions are allocated to such participants.
The agreement also contains a section dealing with the revaluation and allocation of net increase or decrease of the trust fund. Each year the trustees are to determine the total net worth of the trust fund by valuing all of its assets at their then current values. In making such a revaluation, the trustees are to take into account earnings and losses of the trust fund for each year and “capital appreciation or depreciation in such assets, whether or not realized.” The agreement then specifies the manner in which the various assets of the trust fund are to be valued, including shares of stock, bonds, other securities, *565 obligations of the United States, real estate mortgages and any other obligations. The amount credited to the accounts of all of the participants is adjusted annually to equal in the aggregate the value of all of the trust assets. The amount credited to the account of each participant shall be proportionately adjusted “in accordance with the ratio which the sum credited to the account of each such participant bears to the aggregate sum credited to the accounts of all said participants as of the preceding valuation date.”
The normal retirement date is defined in the agreement as the 65th birthday of a participant. Upon normal retirement the entire amount credited to the participant’s account shall be distributed to him: “(a) in one lump sum payment; (b) the purchase and transfer to the participant of a single payment ... annuity contract ...; or (c) payments approximately equal monthly, quarterly, semi-annual or annual installments over a period not to exceed ten (10) years.” The payments may be made in cash, securities, or other property. The agreement also provides that if
distributions are made in kind, or partly in cash and partly in kind, the fair market value of the assets distributed in kind, plus any accompanying cash distributions, shall at the time of distribution be equivalent to the fair market value of such distribution had it been entirely in cash.
The amendments of May 4, 1977, March 28, 1979 and November 12, 1980 were technical in nature and were made primarily to conform the plan and trust to the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. § 1001 et seq., and to regulations issued under the Internal Revenue Code. The amendment of April 15, 1981 does not in any way affect any of the issues before the court. The amendment of November 30, 1983 was made in order to take advantage of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97-248 (1982).
The trust was and is administered in New Jersey. The trust assets and records are located in New Jersey. The employer who funded the trust by employer contributions, that is, the settlor, is located in New Jersey, as already indicated, having its corporate headquarters and main office in the State.
*566 A copy of the account of the trust in the name of plaintiff was marked in evidence. It indicates that he: was born August 4, 1920; was hired by the company on March 22, 1948, and retired on February 7, 1985. The statement indicates that plaintiffs account included company contributions; income earned; and forfeitures credited to the account by virtue of the termination of the trust for the benefit of other employees whose rights had not vested prior to the termination of their employment. Income earned included dividends, interest, gains on sales of assets and appreciation in the value of assets. The account indicated a balance as of December 31, 1984 of $6,460,-998.94. The account further indicated withdrawals totaling that amount in 1985.
In arguing that the lump-sum distribution from the profit sharing plan and trust should not be taxed to him as a nonresident, plaintiff relies on a number of out-of-state cases. In Destito v. Commissioner of Revenue, 23 Mass.App.Ct. 977, 503 N.E.2d 986 (1987), the court held that plaintiff, a resident of New Hampshire, was not liable for 1981 income taxes imposed by Massachusetts on sick leave and annual leave separation payments made to him in that year by the federal government. Destito had lived in New Hampshire since 1964 and was employed by the United States government with a place of work in Bedford, Massachusetts. He became ill on June 14, 1980 and did not work after that time. He was put on extended sick leave until he retired on September 20, 1981. In 1981, he received payment of $42,674, of which $11,210 was payment for unused annual leave, with the balance for sick pay accumulated over 34 years of federal service. His employment took him all over the world and involved absences from Bedford, Massachusetts for as much as six months a year. During such years he filed Massachusetts nonresident income tax returns, apportioning his earnings according to the time he worked within and without Massachusetts. He excluded as nonworking days all Sundays, Saturdays, holidays, sick leave days, annual leave days and other days on which he was not required to perform service at Bedford or at any other place.
*567 The court concluded that, because the taxpayer was not required to perform any work whatsoever in Massachusetts in 1981, he was not liable for the income taxes imposed by the state. The court held that the payments to the taxpayer in 1981 were made because of the terms of his federal employment. The taxpayer received the payments because,
[i]n earlier years when he worked at least part of the time in Massachusetts, he had not used vacation time (annual leave) or sick time to reduce the days actually spent by him at work in Massachusetts as compared with his total working days in each such year. If he had used the annual leave in earlier years, he (without loss of pay) could have been in New Hampshire or some other place and not in Massachusetts and not working. [Id,. 503 N.E.2d at 988]
The court in effect concluded that the compensation received by the taxpayer in 1981 was not for services rendered in Massachusetts at any time. However, because the court concluded that the taxpayer’s compensation was not for services rendered in Massachusetts and, hence, not taxable to him as a nonresident, the case is distinguishable from the present case before the court.
In relying on other out-of-state cases, plaintiff first turns to the provisions of the New Jersey Gross Income Tax Act dealing with gross income for nonresidents. N.J.S.A. 54A:5-5 provides that “the income of a nonresident individual shall be that part of his income derived from sources within the' State as defined in this act.” N.J.S.A. 54A:5-8 defines such income.
Income from sources within this State for a nonresident individual, estate or trust means the same as compensation, net profits, gains, dividends, interest or income enumerated and classified under chapter 5 of this act to the extent that it is earned, received or acquired from sources within this State:
(1) ....; or
(2) in connection with a trade, profession, occupation carried on in this State or for the rendition of personal services performed in this State; or
(3) ....; or
(4) from intangible personal property employed in a trade, profession, occupation or business carried on in this State.
Plaintiff argues that he was a nonresident in 1985 and that he can only be taxed on so much of his 1985 income which was from New Jersey sources. Plaintiff then states, in one of his briefs that, in order to determine the source of his lump sum distribution, it must be broken down into its component parts. *568 “One part is compensation for services, the other parts are income and gains on investments made by the plan.”
“[T]he other parts” are, plaintiff contends, not taxable to him as a nonresident. In Pardee v. State Tax Commission, 89 A.D.2d 294, 456 N.Y.S.2d 459 (1982), the taxpayer was an employee of Chase Manhattan Bank, working in one of its New York offices from 1937 until his retirement in 1973. The bank had an employee profit sharing plan, funded through a federal tax exempt trust to which the bank and the employees contributed. The fund had two separate accounts for each participant, an “allocation account” for bank contributions and a “current deposit account” for the employee’s contributions.
The taxpayer in Pardee was a resident of New Jersey at all pertinent times. When he retired in 1973 he was paid an aggregate of approximately $65,000 as a lump-sum distribution for the then current values of his two accounts with the fund. He filed a nonresident New York state income tax return for 1973 and reported as income the portion of the distribution representing the bank’s contributions. He did not report the portion representing dividends, interest, net gains and appreciation on the investments of his and the bank’s contributions. The commission concluded, however, that income and gains from the portion of the fund representing the bank’s contributions were taxable as income derived from New York sources within the meaning of the applicable New York statute. The determination of the commission was “annulled” by the court.
The court held that the taxpayer’s gains on the investment on the bank’s contributions are not taxable as “income' or gain from a business, trade, profession or occupation carried on in this state,” quoting from the applicable New York statute. N.Y. Tax Law § 632 (McKinney 1975). The court said further that such income and gains are not “compensation for services” rendered to the bank. The court also concluded that the income and gains were not income from intangible personal property employed in a business, trade, profession or occupation carried on in the state. Ibid.
*569 In Donahue v. Chu, 104 A.D.2d 523, 479 N.Y.S.2d 889 (1984), the taxpayer was an executive of a New York corporation for approximately 26 years and for a substantial period of time was its president. In 1975, the executive offices of the corporation were moved from New York City to Connecticut and, in the same year the taxpayer changed his residence from New York to Connecticut. His employment contract was also terminated in the same year. He was paid certain amounts of money pursuant to the termination agreement which he did not report on his New York state income tax return. He claimed that the unreported income was that of a nonresident of New York and was not connected with any New York source. The commission concluded that taxpayer’s New York taxable income included $994,611.40 he received for the cancellation of stock options granted him by the corporation while he was employed in New York, during the years 1968, 1970, 1971 and 1974. The options were never exercised, and by a provision in the 1975 agreement the taxpayer canceled the options in exchange for the payment to him of the $944,611.40. This amount was determined by subtracting the aggregate exercised price from the aggregate fair market value at the time of cancellation.
The court first concluded that stock options are compensation and are taxable as such. The court, however, concluded that the taxing authority had erred in computing the tax base. It ruled that the event of sale as the date of determination of value does not apply to the allocation of income attributable to New York sources. The court said that the proper method would have been to subtract the aggregate exercised price from the aggregate fair market value of the stock on the date that the options became exercisable. Finally, the court said that the appreciation of the market value of the common stock had no connection with the rendering of services in New York. A dissent argued that the options were granted in New York for sendees rendered in New York by a New York resident for a New York corporation and that virtually all of the appreciation in the value of the options occurred while both the petitioner and the corporation were in New York. Accordingly, the *570 dissent argued that the date of cancellation was the date to value the options for the purpose of determining their value for tax purposes.
In his pretrial brief, plaintiff also cites the case of Michaelsen v. New York State Tax Commission, 107 A.D.2d 389, 486 N.Y.S.2d 479 (1985). In that case the taxpayer was granted certain stock options in 1968 by his New York employer under an employee stock option plan. The taxpayer purchased shares pursuant to the plan and sold them in 1973 deriving a gain of $179,761. The taxpayer was a resident of the State of Connecticut in 1973 and did not report the gain on his 1973 New York nonresident income tax return. The tax was imposed, however, on the basis that the stock was acquired through the exercise of a stock option plan connected with petitioner’s employment and that the gain from the sale of the stock was income under applicable New York law. The court disagreed, relying on Donahue v. Chu, and concluded that there was no evidence connecting the granting of the options with the subsequent appreciation in the market value of the stock. Therefore, there was no connection with the rendering of services in New York, and the only income attributable to New York was the value of the stock option on the date it became exercisable. The matter was remanded to the New York State Tax Commission for a determination consistent with the opinion.
In arguing that the lump-sum distribution received by plaintiff from the plan in 1985 is taxable to him as a nonresident, defendant relies on (1) N.J.S.A. 54A:5-l.j.; (2) N.J.S.A. 54A:5-8, claiming that the distribution was “earned, received and acquired” from a New Jersey corporation and its profit sharing plan in connection with plaintiff’s occupation carried on in New Jersey for over 30 years; and (3) formal opinion # 5-1979 of the Attorney General of New Jersey which provides in part as follows:
N.J.S.A. 54A:2-1 provides for imposition of the tax upon every individual’s “New Jersey gross income as herein defined ...” subject to certain deductions, limitations and modifications set forth in the act. The term “gross income” is defined in N.J.S.A. 54A:5-l(j) to include pensions and annuities except to the extent of exclusions in section 54A:6-10 hereunder, notwithstanding the provi *571 sions of [the sections of public pension laws which provide an exemption of such benefits from state taxation]____
New Jersey gross income is defined as, among other things, “[ajmounts distributed or withdrawn from an employee trust attributable to contributions to the trust which were excluded from gross income....” N.J.S.A. 54A:5-l.j. Defendant contends that such payments from the trust were received by plaintiff in connection with his occupation as an employee of NTD. Arguing that the total distribution from the plan in 1985 should be taxed to plaintiff, even if he was a nonresident, defendant contends that there is no authority in New Jersey law permitting the court to fragment the distribution, allocating part of it to employer contributions and part of it to dividends, interest and increases in value of the assets in the hands of the trustees of the plan. Defendant relies on Michaelsen v. New York State Tax Commission, 67 N.Y.2d 579, 505 N.Y.S.2d 585, 496 N.E.2d 674 (1986), which reversed the appellate division decision on the very point for which plaintiff cited it. The Court of Appeals of New York held that the taxable gain was the difference between the option price and the fair market of the stock on the date the option was exercised.[6]
The court of appeals concluded that the stock was connected with petitioner’s employment and ruled that the gain derived from the exercise of the option was taxable to the nonresident taxpayer in New York. The court quoted from the trial court opinion which said that “there was no evidence indicating that the options through which the stock was acquired were issued other than as a form of compensation to ... [the taxpayer] for either past services or incentive for future services to his employer.” 505 N.Y.S.2d at 587, 496 N.E.2d at 676. The court held that gain derived from employee stock options is realized *572 when the option is exercised, and the option is valued by-subtracting the option price from the fair market value of the stock when the option is exercised. This gain is compensation for services performed. To tax the option with regard to its fair market value at the time it is exercisable would leave much of the economic value of the option untaxed. “The option privilege is the opportunity to benefit from any increase in the value of property subject to the option during such period without risking any capital.” Id. 505 N.Y.S.2d at 588, 496 N.E.2d at 677. In effect, the court refused to fragment the benefit to the employee into two parts, one consisting of the value of the option when exercisable and the other consisting of the increase in the value of the option between the time it was exercisable and the time it was exercised.
As well as disposing of the appellate division decision in Michaelsen relied on by plaintiff, the court of appeals decision in Michaelsen disposes of Donahue v. Chu. It also casts much doubt on the validity of Pardee v. State Tax Commission, supra, even though Pardee deals with a profit sharing plan and Michaelsen deals with a stock option plan. The basic concept central to both cases is the manner in which appreciation in the value of the assets in the plans should be taxed.
The refusal of the court of appeals to fragment the employee benefit in Michaelsen may be taken as an indication that it would refuse to fragment the employee benefit from a profit sharing plan. The court would no doubt conclude that the appreciation in the value of assets in a profit sharing plan is compensation for services rendered much as it held the gain in the stock option case was such compensation. Otherwise, as in the stock option case, much of the economic value of the profit sharing plan would not be taxed. In any event, I decline to follow Pardee. It is not binding on me, and its reasoning is unacceptable in interpreting a gross income tax such as New Jersey’s.
In order to deal with the claim by plaintiff that the income-received by him should be treated in a fragmented manner, it is *573 necessary to review the nature of a profit sharing plan. It is one of only three types of plans provided for in the first sentence of I.R.C. § 401(a): profit sharing plans, stock bonus plans and pension plans. A qualified profit sharing plan, of which the subject plan is one, has certain restrictions, but it also has substantial advantages. They are:
(1) An employee participating in a qualified plan, unlike her counterpart in a nonqualified plan, does not have to pay income tax on her employer’s contribution until she actually receives it, even though she may have acquired a nonforfeitable interest in that contribution many years before. § 402(a)(1).
(2) The employer may deduct contributions to a qualified plan as soon as they are made, even if no employee has a nonforfeitable interest in those contributions at that time. § 404. Thus, qualified plans remove that tension we noted in the previous chapter between the employee’s desire for deferred taxation and the employer’s desire for immediate deductions.
(3) Any trust by means of which a qualified plan is funded is exempt from income tax. § 501(a).
(4) Funds payable to the beneficiary of a deceased participant in a qualified plan may be excludable from the participant’s gross estate for estate tax purposes. § 2039(c).
(5) If a distributee’s interest under a qualified plan is paid in a lump sum, the interest may be taxed more favorably than ordinary income. § 402(a)(2) and (e)(4)(E).
(6) Under certain circumstances, the § 101(b) $5,000 income tax exclusion for employee death benefits will be available only if the benefit is paid pursuant to a qualified plan. [Sherman, Pension Planning and Deferred Compensation 91 (1985)]
Indeed, a qualified profit sharing plan is “an extraordinarily attractive tax shelter.” Id. at 92.
A profit sharing plan must be “primarily a plan of deferred compensation.” Treas.Reg. § 1.401 — l(b)(l)(ii) (1963). A certain period of deferral is required:
[T]he funds accumulated under the plan [may not be distributed until the elapsing of] a fixed number of years, the attainment of a stated age, or upon the prior occurrence of some event such as lay-off, illness, disability, retirement, death, or severance of employment. \Ibid.1
Clearly then, a profit sharing plan is the deferring of what might otherwise be current compensation, to accomplish the purposes of the employer and to benefit the employee by providing income to him under more favorable tax circumstances.
*574 Among other reasons, profit sharing plans are designed for the purposes of ensuring a closely knit business organization, attracting and retaining competent, skilled and dedicated employees at all levels, and providing incentives for employee training and education which would result in improved profits, thereby benefiting both the business and the employees. Cf. Auner v. United States, 440 F.2d 516 (7 Cir.1971). These purposes are achieved by providing compensation to employees, from profits, over and above their regular compensation by way of salary, wages or other regular compensation, such as bonuses. To accomplish the purposes in a manner which will be meaningful to the business, the compensation is deferred through the mechanics of a profit sharing plan, but it is nevertheless compensation to employees for services rendered to the business.
Once the profit sharing plan is established, for New Jersey gross income tax purposes, it must be regarded as a unit used by the employer to compensate the employee. All benefits in that unit are taxable as compensation for services rendered. Commissioner v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956), is enlightening on the point. Although not involving a profit sharing plan, the Court’s discussion of taxable compensation is particularly helpful in determining that all of the benefits realized by the taxpayer in this case are taxable to him under the New Jersey Gross Income Tax Act. Otherwise, substantial benefits realized by the taxpayer would go untaxed. LoBue involved a stock option plan through which the taxpayer received options and with which options he purchased stock for $1,700, having a market value when delivered to him of $9,930. The commissioner viewed the gain to LoBue as compensation for personal services under § 22A of the Internal Revenue Code of 1939, 53 U.S.C.A. 9, as amended, defining gross income as including “gains, profits, and income derived from ... compensation for personal service ... of whatever kind and in whatever form paid____”
In holding that LoBue was subject to tax for the entire benefit received, the Court used language particularly appropri *575 ate for a case involving the New Jersey Gross Income Tax Act. “We have repeatedly held that in defining ‘gross income’ as broadly as it did in § 22A, Congress intended to ‘tax all gains except those specifically exempted.’” Id. at 246, 76 S.Ct. at 803. The stock option plan was used by the employer to realize “[mjore profitable operations by providing the employee ‘with an incentive to promote the growth of the company by permitting them to participate in its success.’ ” Ibid. There is to be included in taxable income “any economic or financial benefit conferred on the employee as compensation, whatever the form or mode by which it is effected.” Id. at 247, 76 S.Ct. at 803. LoBue was held to have received substantial economic and financial benefits from his employer provided to him because of the employer’s desire to get better work from the employee. The court held that this was “compensation for personal service.” Since allowing the purchase of the stock at the option price was, in reality, compensation, the gain was taxable. Valuable property was transferred to the employee in recognition of his services, and a taxable gain was realized when the stock was purchased by the exercise of the option. Simply put, the appreciation in the value of the stock was compensation to LoBue.
The same is true of plaintiff in the present case. The profit sharing plan was established to provide the employee with substantial economic and financial benefits so that the employer would get better work from the employee. The providing of the profit sharing plan and all of the “economic and financial benefits]” flowing from the profit sharing plan to the employee constitute compensation for personal services rendered by the employee to the corporation.
All increases in the value of the employer’s contributions to the profit sharing plan, “whatever the form or mode,” are taxable to plaintiff as compensation for services rendered or was received by him, as a nonresident, “[i]n connection with a[n] ... occupation carried on in this State____” N.J.S.A. 54A:5-8(2).
*576 In Gosewisch v. Com., Dept. of Revenue, 40 Pa. Commw. 565, 397 A.2d 1288 (Pa.Commw.Ct.1979), the court reached a similar result holding that a distribution to the taxpayer from his employer’s profit sharing trust was compensation for services rendered. 72 Pa.Cons.Stat. § 7301 et seq. The court held that the entire payment was taxable in the year of receipt by the taxpayer and concluded that the entire payment was compensation under Pennsylvania law. An issue similar to that in Gosewisch was presented in Cook v. Revenue Division, 396 Mich. 176, 240 N.W.2d 247 (Sup.Ct.1976), by virtue of the effective date of the Michigan income tax, because “an income tax had just been imposed.” Id. at 251. Although the result in Cook is different from Gosewisch with regard to the taxability of income prior to the effective date of each state’s income tax, in dealing with profit sharing plans, the court in Cook said that employer “contributions and appreciation or depreciation attributable thereto are fully taxable to the taxpayers.” Ibid. While the result in Cook may be based on the disposition of an asset, as opposed to the definition of compensation for services rendered, both cases concluded that employer contributions, income realized by the plan, and appreciation in the assets in the plan are income taxable to the taxpayer in the year of receipt; and Pennsylvania treats the income realized by the plan and the appreciation in the value of the assets in the plan as compensation for services rendered.
To the same effect is Succession of Chapman H. Hyams, III, 199 So.2d 29 (La.Ct.App.1967), in which the court held that a qualified profit sharing plan was not a charitable trust under Louisiana law.
The provisions of the trust itself reveal that it was created primarily to pay the employees’ retirement or pension emoluments. The sums so paid are not gifts, but are funds earned by the employees who performed services for the Times-Picayune Publishing Company consistently for a considerable number of years in order to entitle them thereto, over and above the salary they received from the Company, and are properly to be considered as added compensation. [Id. at 35]
In imposing an inheritance tax on the death benefit paid to the widow of an employee from his employer’s profit sharing *577 plan, the court in Gould v. Johnson, 156 Me. 446, 166 A.2d 481 (Sup.Ct.1960), held that the “interest of the decedent in the trust fund was in effect deferred compensation earned by him through loyal service.” Id. at 484. The plan in the Gould case was similar in many respects to the plan presently before this court.
By regarding the income and asset appreciation as compensation for services rendered, the purpose of the New Jersey Gross Income Tax Act is carried out and the legislative intent effectuated. “New Jersey’s [income] tax ..., is on gross income, reduced only by certain limited deductions and credits.” Sorensen v. Taxation Div. Director, 184 N.J.Super. 393, 2 N.J. Tax 470, 476, 446 A.2d 213 (Tax Ct.1981); emphasis supplied. In Gould v. Johnson, supra, the court came to a similar conclusion concerning legislative intent. “As the taxing statute is now written, we are satisfied that it is broad enough and was intended by the Legislature to cover such a transfer of an interest in a trust fund as is found here.” Id. 2 N.J. Tax at 485.
The present profit sharing plan itself, established as it is to benefit both the employer and the employee, constitutes compensation for services rendered. Such compensation is realized by the taxpayer when he receives payment from the plan, that is to say, when the benefits accruing in the plan for his account are withdrawn by him. Such compensation consists not only of the employer’s contributions,[7] but also all gains which such employer contributions realize in the plan. The method of taxation of the withdrawals under the Internal Revenue Code is the correct method to be used for taxing the withdrawals for New Jersey gross income tax purposes.[8] N.J.S.A. 54A:6-21 provides as follows:
Gross income shall not include amounts contributed by an employer on behalf of and at the election of an employee to a trust which is part of a qualified cash *578 or deferred arrangement which meets the requirements of § 401(k) of the 1954 Internal Revenue Code [9] as amended.
The statement of the Senate Revenue, Finance and Appropriations Committee attached to this statutory provision, Assembly Bill 3251 (1983), states that it “exempts from gross income, for income tax purposes, the amount an employer contributes on behalf of employees to an employer-sponsored tax deferred retirement plan. The proposal would conform the treatment of such contributions to their treatment under the provisions of the Internal Revenue Code.”
The fiscal impact part of the statement indicated that the revenue lost by virtue of this statutory provision might be recaptured after the retirement of the employee or withdrawals from the trusts in future years. In conforming the treatment of employer contributions to their treatment under the provisions of the Internal Revenue Code, the Legislature should be understood, as well, to conform the treatment of distributions, and withdrawals, from such trusts to their treatment under the provisions of the Internal Revenue Code.
The nature of the gross income of nonresidents to be taxed is emphasized by the provisions of N.J.S.A. 54A:5-8(2) relating to both an “occupation” and the “rendition of personal services.” As already indicated, nonresidents are taxed not only on compensation, gains and income received or acquired from sources within this State “for the rendition of personal services performed in this State,” but also on compensation, gains and income received or acquired from sources within this State “[i]n connection with a[n] ... occupation carried on in this State....” N.J.S.A. 54A:5-8(2).
Plaintiff has cited Pardee v. State Tax Commission, supra, which held that the taxpayer’s gains on the investment in the profit sharing plan were not taxable as income from an occupation nor compensation for services rendered. However, plaintiff argues primarily that the income on, and appreciation in, *579 the investment in his profit sharing account is not compensation to him for services rendered, basically ignoring the “occupation” provision of N.J.S.A. 54A:5-8(2). Indeed, plaintiff could do no less. Contrary to Pardee, not only was the profit sharing plan established and payments made to plaintiff from it as compensation for services rendered, but they were clearly made in connection with plaintiffs occupation. These last words relating to occupation in the statutory provision dealing with nonresidents are not to be found in the definition of gross income generally in N.J.S.A. 54A:5-1, nor anywhere else in chapter 5, N.J.S.A. 54A:5-1 et seq., dealing with gross income and to which the provision on income from sources within this State for nonresidents refers. The words are in the statute to insure that income of nonresidents from all sources within the State is taxed. They are not superfluous nor meaningless, and they may not be disregarded. “It is a cardinal rule of statutory construction that full effect should be given, if possible, to every word of a statute. We cannot assume that the Legislature used meaningless language.” Gabin v. Skyline Cabana Club, 54 N.J. 550, 555, 258 A.2d 6 (1969).
The gross income of the taxpayer is to be taxed. The income includes all payments received by him from the profit sharing plan, because he received such payments for the rendition of personal services or in connection with an occupation carried on in this State, that is, his employment by NTD. It is simply not true that the dividends, interest and appreciation in value of the assets in the profit sharing plan are no more than income derived from intangible assets held in New Jersey and which would not be taxable to a nonresident.
One other issue requires resolution. During the years of his employment by NTD, and while he was a resident of New Jersey, plaintiff sometimes traveled outside of New Jersey on company business. As a nonresident in 1985, he claims that the travel and the services rendered for the company were the engaging “in a business, trade, profession or occupation partly ... without this state” bringing him under the provisions of *580 N.J.S.A. 54A:5-7 requiring an allocation of his income. Plaintiff contends that he should not be taxed on the profit sharing plan payments attributable to such services.
Plaintiff was on the cash basis for income tax purposes in 1985. It is beyond dispute that his income is to be taxed in accordance with its nature in the year of receipt. Smoyer v. Taxation Div. Director, 4 N.J.Tax 42, (Tax Ct.1982), aff’d 95 N.J. 139, 469 A.2d 920 (1983); DuBois v. Taxation Div. Director, 4 N.J.Tax 11 (Tax Ct.1982), aff’d 6 N.J.Tax 249 (App.Div.1982).
There is no evidence before me that plaintiff performed any services outside of New Jersey for NTD in 1985. The resolution, therefore, of this issue is that, since plaintiffs contention is based on his status as a nonresident in 1985 when he received payment from the profit sharing plan and since he .did not engage in any occupation without the State in 1985, he does not come under the provisions of N.J.S.A. 54A:5-7.
It may be, however, that engaging in an occupation without the State in the year of receipt of deferred compensation would not necessarily require an allocation of such deferred compensation under N.J.S.A. 54A:5-7. The status of the taxpayer may have to be determined as of the time he performed the services. A determination of that issue will have to abide its presentation to the court.
The Clerk of the Tax Court will enter a judgment affirming the assessment of taxes imposed by defendant on plaintiff as a nonresident.

Plaintiffs, husband and wife, are parties to this proceeding because they filed a joint return. However, all activities at issue in regard to taxable income are those of the husband, Malcolm W. McDonald, and I, therefore, refer to him as plaintiff.

There was deducted from the capital gains a capital loss with a source outside of New Jersey allowed to plaintiff as a resident of New Jersey. See infra.

A taxpayer or a married couple filing a joint return with a gross income of $3,000 or less is not subject to tax. N.J.S.A. 54A:2-4. This is the position taken by plaintiff in his pleadings although he filed a 1985 New Jersey nonresident gross income tax return reporting $32,425 as taxable income with a New Jersey source from which New Jersey taxes were withheld.

Plaintiff subsequently moved to another residence in Delray Beach in 1985 and now lives at 200 North Ocean Boulevard, Delray Beach, Florida.

The trust was also amended on February 12, 1986. Although plaintiff confmued as a trustee, this amendment has no bearing on this case because of plaintiffs witndrawal from the plan in 1985.

Another issue before the court, not relevant to the present proceeding, was the manner in which the gain derived from the subsequent sale of the stock should be taxed. The court held that such gain, accruing after the purchase of the stock by the taxpayer through the exercise of the option, is not income derived from New York sources and is thus not taxable by New York. No such issue is presently before this court.

N.J.S.A. 54A:5-1.j. provides that the employer contributions are gross income when distributed or withdrawn.

Except for the $10,000 reduction in the amount of the pension payment.

 26 U.S.C.A. § 401(k).